**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** 09-220 (PLF) |
| | : | |
| **v.** | : | |
| | : | **VIOLATION:** |
| **ROBERT KRAAIPOEL,** | : | **Conspiracy to Export to** **FILED** |
| | : | **Embargoed Country** |
| **Defendant.** | : | **(18 U.S.C. § 371)** SEP 2 4 2009 |

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

Had this case gone to trial, the government would have proven beyond a reasonable doubt that:

1.     Defendant AVIATION SERVICES INTERNATIONAL B.V. ("ASI") is an aircraft parts supplier in the Netherlands which was founded in 1986.  The company is registered in the Netherlands with its principal offices located at Fleming Straat 36, 1704 SL, Heerhugowaard, the Netherlands.  Defendant ASI also does business under the name of DELTA LOGISTICS B.V.  DELTA LOGISTICS is a company registered in the Netherlands, with a mailing address of P.O. Box 11, 1700AA Heerhugowaard, Netherlands.

2.     Defendant ROBERT KRAAIPOEL is a citizen and resident of the Netherlands and is the Director or principal officer of ASI.  As the Director or principal officer, Defendant ROBERT KRAAIPOEL directs and controls the business of Defendant ASI.

3.     Defendant ROBERT NIELS KRAAIPOEL, also known as NIELS KRAAIPOEL (hereinafter "NIELS KRAAIPOEL"), is a citizen and resident of the Netherlands and is the Sales Manager of ASI.  As the Sales Manager of ASI, Defendant NIELS KRAAIPOEL is responsible for filling orders for domestic and foreign buyers for ASI.  Defendant NIELS KRAAIPOEL is

also a shareholder of DELTA LOGISTICS.

The Iran Trade Embargo and the Iranian Transactions Regulations

4.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorizes the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat.

5.      On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."  Executive Order No. 12957, as expanded and continued by Executive Orders Nos. 12959 and 13059, was in effect at all times relevant to this Information.

6.      Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran.  The Executive Orders prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

7.      The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the

-2-

Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations , 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

8.      The Iranian Transactions Regulations prohibit, among other things, the export, reexport, sale, or supply, directly or indirectly, of any goods, technology, or services from the United States or by a United States person, wherever located, to Iran or the Government of Iran, without prior authorization or license from the United States Department of the Treasury, through the Office of Foreign Assets Control, located in the District of Columbia.  These regulations further prohibit any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the Iranian Transactions Regulations, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran. The Iranian Transactions Regulations were in effect at all times relevant to this Information.

9.      At no time did the defendants, ASI, ROBERT KRAAIPOEL and NIELS KRAAIPOEL, apply for, receive, or possess a license or authorization from the Office of Foreign Assets Control to export goods, technology, or services, of any description, to Iran.

10.     Beginning in or around October 2005 and continuing through in or around October 2007, within the District of Columbia and elsewhere, the defendants, ASI, ROBERT KRAAIPOEL and NIELS KRAAIPOEL, and others known and unknown to the United States Attorney, willfully combined, conspired, confederated, and agreed with each other to violate IEEPA and the Iranian Transactions Regulations by exporting aircraft components and other items to end users in Iran without first obtaining licenses from the United States Department of Treasury, Office of Foreign Assets Control, located in the District of Columbia.

-3-

**Objects of the Conspiracy**

11.     The objects of the conspiracy were:

a.      to make money for Defendant ASI and its principal officers, including Defendants ROBERT KRAAIPOEL and NIELS KRAAIPOEL;

b.      to supply entities in Iran with aircraft components and parts from the United States;

c.      to evade the prohibitions and licensing requirements of IEEPA and the Iranian Transactions Regulations; and

d.      to conceal the prohibited transactions from detection by the United States government so as to avoid penalties and disruption of the illegal activity.

**Manner and Means of the Conspiracy**

12.     The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

a.      Defendants ASI, ROBERT KRAAIPOEL, NIELS KRAAIPOEL and others employed by ASI received orders from customers in Iran for U.S. origin goods restricted from being transhipped into Iran by IEEPA and the Iranian Transactions Regulations;

b.      Defendants ASI, ROBERT KRAAIPOEL, NIELS KRAAIPOEL and others employed by ASI contacted companies in the United States and negotiated purchases of materials on behalf of Iranian customers;

c.      Defendants ASI, ROBERT KRAAIPOEL, NIELS KRAAIPOEL and others employed by ASI intentionally failed to disclose or concealed to certain U.S. companies that an Iranian customer was the true recipient of the U.S. origin products;

-4-

d.      Defendants provided false end-user information and documentation to certain U.S. companies that concealed the fact that an Iranian customer was the true recipient of the U.S. origin products;

e.      In order to conceal from the United States government that materials were being exported to customers in Iran, Defendants ASI, ROBERT KRAAIPOEL, NIELS KRAAIPOEL and others employed by ASI caused certain U.S. companies in the United States to ship the components and parts to Defendant ASI in the Netherlands or addresses in other countries, including the United Arab Emirates ("U.A.E.") and Cyprus.  Upon arrival of the ordered materials in the Netherlands or these other countries from the United States, the items were repackaged and transshipped to Iran; and

f.      Defendants ASI, ROBERT KRAAIPOEL, NIELS KRAAIPOEL and others employed by ASI caused the aircraft components and parts to be exported from the United States to individuals and entities in Iran without obtaining a license from the Office of Foreign Asset Controls, United States Department of Treasury, located in the District of Columbia.

**Overt Acts**

13.      In furtherance of this conspiracy, Defendants ASI, ROBERT KRAAIPOEL, and NIELS KRAAIPOEL, and other co-conspirators committed overt acts, including but not limited to the following:

Procurement of Electronic Communications Equipment

(1)      On October 28, 2005, Defendant ROBERT KRAAIPOEL placed an order with Company A to purchase electronic communications equipment, specifically, two video receiver units, a model DVBR 1000S and a model DVBR 1000L B, and a DVRPT-BC-XX-5000 video

repeater.  Company A is a U.S. company located in New Hampshire. These items were sent for shipment to Company B in Georgia, to await export to Defendant ASI in the Netherlands;

(2)     On November 3, 2005, a Company A representative sent an e-mail to Defendant NIELS KRAAIPOEL at Defendant ASI, requesting that he identify the end user(s) for the items as required by United States law.  On November 4, 2005, Defendant ROBERT KRAAIPOEL replied to the request, stating that the equipment was destined for Poland, for use by the Polish Border Control Agency.  Such a purported end-use or destination did not require a validated license or specific authorization from the U.S. Commerce Department for the export by Company A;

(3)     On or about November 4, 2005, Defendant ROBERT KRAAIPOEL also informed the freight forwarder of the shipment, Company B, that the items were destined for Poland, for use by the Polish Border Control Agency;

(4)     Company B entered the required information concerning the end-user or ultimate destination of the export, i.e., Poland, into the Automated Export System, which is maintained by the U.S. Department of Homeland Security, Customs and Border Protection, and used this end-user information to prepare documents submitted to the United States government in connection with the November 2005 export;

(5)     On or about November 5, 2005, the equipment was exported to Defendant ASI in the Netherlands by Company B;

(6)     On November 18, 2005, Defendants ROBERT KRAAIPOEL and ASI sought to purchase additional communications equipment from Company A and sent to Company A a purchase order for three Model VML 5000- ENC video transmitters, three VMS2-5000-ENC video transmitters, and fifteen model 701145-072 microphones;

(7)     In response to a November 19, 2005, e-mail from a Company A representative to Defendant ROBERT KRAAIPOEL at Defendant ASI requesting end user information for this equipment, Defendant ROBERT KRAAIPOEL replied on November 22, 2005, that this equipment was also destined for the Polish Border Control Agency;

(8)     The equipment was purchased from Company A by Defendant ASI;

(9)     Defendant ASI arranged for the equipment to be exported to the Netherlands on or about January 26, 2006;

(10)    Defendant ASI then transshipped the equipment to an Iranian customer soon after the items arrived in the Netherlands;

(11)    On April 16, 2007, an employee of Defendant ASI sent an e-mail to Company A, requesting a quote or the price to purchase spare parts for use in the communications equipment previously purchased by Defendant ASI and referenced above;

(12)    In response to an April 20, 2007, response from Company A requesting end user information and certification for the equipment, on May 7, 2007, the same Defendant ASI employee responded to Company A with an e-mail and an attached letter from Company C, a business purportedly located in Cyprus, certifying that it would be the end user of the equipment even though Defendants ASI, ROBERT KRAAIPOEL, and NIELS KRAAIPOEL knew that the true end user of the U.S. origin goods purchased from Company A was an Iranian customer;

(13)    Defendants ASI, ROBERT KRAAIPOEL, and NIELS KRAAIPOEL entered into a business relationship with an Iranian businessman who controls Company C in or around 2004 in order to facilitate the supply of U.S. origin goods to Iranian customers;

-7-

Attempted Procurement of Aluminum Sheets and Rods

(14)    On February 21, 2007, Defendant ROBERT KRAAIPOEL sent a purchase order or request from Defendant ASI in the Netherlands to an employee of Company D in Florida to purchase aluminum sheets and rods - Model 2024T-3.

(15)    On March 28, 2007, Defendant ROBERT KRAAIPOEL telephoned the same employee of Company D to tell the employee that he still wanted to purchase the aluminum sheets and rods but that he wished to insert the name of a Netherlands company, TPC, B.V., on the shipping and invoice documents;

(16)    In or about April, 2007, Defendant ASI paid approximately $9,600 for and purchased the aluminum sheets and rods -- Model 2024T-3 from Company D, which is located in Florida;

(17)    The goods were shipped on or about April 6, 2007, upon Defendant ROBERT KRAAIPOEL's direction to Company E, a freight forwarder in Miami, Florida, to await export to the Netherlands;

(18)    Company E was instructed by Defendant ROBERT KRAAIPOEL to list the country of ultimate destination as the Netherlands;

(19)    Company E subsequently in April 2007 completed shipping documents, including an electronic shipper's export declaration, which was entered and filed by Company E in the computerized Automated Export System.  The information entered in the Automated Export System by Company E concerning the shipment of aluminum sheets and rods by Defendants ASI and ROBERT KRAAIPOEL listed the Netherlands as the ultimate destination;

(20)    Defendant ASI attempted to ship these aluminum sheets and rods originating

from Company D from the Netherlands to Iran, but Dutch Customs officials detained the shipment on April 20, 2007;

<u>Attempted Procurement of Polymide Film</u>

(21)    Defendant ASI, doing business as DELTA LOGISTICS, B.V., purchased 2-Mil-Kaptonn polymide film from Company F, located in Kansas.

(22)    After the shipment of products from Company F was detained on March 30, 2007, by U.S. officials when it was discovered that DELTA LOGISTICS, B.V., was located at the same physical address as Defendant ASI, Defendant ASI was contacted by Company E, the freight forwarder, and notified that an end-user statement would have to be provided before the shipment could be exported.  Defendant ASI did not provide this information and the polymide film remained in storage at the Company E facility in Illinois.  In July 2007, a representative of Company F received a telephone call from Defendant ROBERT KRAAIPOEL concerning the shipment of polymide film;

(23)    Defendant ROBERT KRAAIPOEL informed the representative of Company F that he had a potential buyer for the polymide film, and this customer was identified as Company G, located in Dubai, U.A.E.;

(24)    Defendant ASI arranged for Company F to receive on July 9, 2007, a purchase order and end user statement purporting to be from a representative of Company G, stating that the polymide film was destined for the U.A.E. and would be used for sealing large electromotor fittings;

(25)    Defendant ASI facilitated this transaction despite the fact that, based on prior transactions involving Company G, Defendants ASI, ROBERT KRAAIPOEL, and NIELS KRAAIPOEL knew that Company G placed orders on behalf of customers in Iran.  Thus, the

defendants knew that this order, had it been filled by Customer F, would have been transhipped through the U.A.E. to a customer in Iran;

<u>Supply of Aircraft Parts to Iranian Company</u>

(26)   On June 21, 2007, Defendant ASI sent an e-mail to a representative of Company H,  located in Dubai, U.A.E.   The e-mail was sent as a response to a request for a quotation for a list of aircraft parts that contained U.S. origin goods;

(27)   In the e-mail, a Defendant ASI representative stated that she had conducted an internet search of Company H's name and location and that the search revealed that the company was based in Iran;

(28)   On September 7, 2007, Defendant NIELS KRAAIPOEL, using DELTA LOGISTICS, B.V., letterhead, provided a quotation for over two hundred thousand dollars worth of U.S. origin aircraft parts and supplies to the purchasing manager of Company H despite knowing that Company H was located in Iran and procuring items for Iranian customers; and

(29)   Defendants ASI and NIELS KRAAIPOEL continued to quote and fill orders for Company H throughout much of August, September, and October of 2007.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

By:   _____
Ann H. Petalas
Assistant United States Attorney
Texas Bar No. 24012852
National Security Section

-10-

555 Fourth Street, NW
Washington, D.C.  20530
(202) 307-0476
Ann.Petalas@usdoj.gov

Denise Cheung
Assistant United States Attorney
Bar No. 451714
National Security Section
555 Fourth Street, NW
Washington, D.C.  20530
(202) 307-2845
Denise.Cheung@usdoj

Ryan Fayhee
Trial Attorney
IL Bar No. 6281368
Counterespionage Section
National Security Division
United States Department of Justice
Washington, D.C. 20005
(202) 307-2050
Ryan.Fayhee@usdoj.gov

Jonathan Poling
Trial Attorney
Bar No. 489459
Counterespionage Section
National Security Division
United States Department of Justice
Washington, D.C. 20005
(202) 305-0179
Jonathan.Poling@usdoj.gov

Dated: ___9/22_____, 2009

-11-

Defendant's Stipulation and Signature

I have read and discussed this Factual Proffer in Support of Guilty Plea fully with my attorney, Mark Rochon.  After consulting with my attorney and pursuant to the plea agreement entered into this day with the United States, I hereby stipulate that the above statement of facts is true and accurate.  I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____9|22|09_____
Date

By:  _____Robert Kraaipoel_____
        Defendant

Attorney's Acknowledgment

I am counsel for Robert Kraaipoel.  I have carefully reviewed the above statement of facts with my client.  To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

_____9-22-09_____
Date

_____Mark J. Rochon, Esq._____
Counsel for Robert Kraaipoel

-12-